## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

VAN DYKE HORN, LLC,
a Michigan limited liability company,

   Plaintiff,

v.

PETER VAN DYKE, an individual,
MICHAEL SHERMAN, an individual,
JAMIE KAYE WALTERS, an individual,
and
VVK PR & Creative, a Michigan limited
liability company, jointly and severally,

   Defendants.

Case No.   22-11141

_____/

Reginald Turner (P40543)
Linda M. Watson (P45320)
Magy E. Shenouda (P85576)
Attorneys for Plaintiff
CLARK HILL PLC
151 S Old. Woodward Ave., Suite 200
Birmingham, MI 48009
248.988.5881

_____/

## VERIFIED COMPLAINT AND JURY DEMAND

NOW COMES Plaintiff Van Dyke Horn, LLC ("VDH" or "Plaintiff") by and

through its counsel, Clark Hill PLC, and as its Verified Complaint against

Defendants Peter Van Dyke ("Van Dyke"), Michael Sherman ("Sherman"), an

individual, Jamie Kaye Walters ("Walters"), an individual, and VVK PR & Creative, LLC, a limited liability company, ("VVK"), (collectively "Defendants") states as follows:

## **INTRODUCTION**

1.     This case is about an equity member, officer and high-level executive of VDH, Peter Van Dyke, intentionally diverting and misappropriating trade secrets of VDH and converting assets of VDH, including clients, for his own benefit after failing to force his partner, Marilyn Horn, to sell her interest in VDH to him for pennies.  And, Van Dyke was not working alone. Van Dyke was conspiring with VDH competitors, Sherman and Walters, to take VDH trade secrets and business for their own and a competing company, VVK, they were in the process of forming.  In fact, Van Dyke was so brazen and felt so entitled that while he was still an equity member of VDH with fiduciary duties owed to it, he secretly solicited and convinced several VDH's key employees to join him and the other Defendants in their secret scheme, all the while knowing that these same employees had restrictive covenants in their VDH employment agreements, and tried to convince prospective VDH staff to reject their offers from VDH and instead join VVK.

2.     Days before resigning from VDH, Van Dyke secretly loaded up VDH client files and corporate information into two large zip files and emailed them to his personal email so that he and Defendants could utilize them to compete.  He also

used VDH financial information to create a business plan and copied VDH contracts verbatim.  And, he secretly met with clients and employees to persuade them to leave VDH and join his new competing company.  Given his clandestine activities, in hindsight, it is no surprise that Van Dyke refused to sign a declaration on his last day to verify that he had returned and was not taking any of VDH's trade secrets.

3.     Defendant Van Dyke and the other Defendants wrongfully and improperly utilized VDH's protected trade secrets and other confidential information knowing it was the property of VDH and knowing their use was unauthorized.  And, Defendants continue to use VDH's protected trade secrets and confidential information which they improperly acquired.

4.     By misappropriating VDH's trade secrets and disparaging VDH, Defendants were able to convert, practically overnight, several long-term VDH clients and they continue to target VDH clients and employees using VDH's trade secrets.  Indeed, the focus of their secret business plan, which was found after a search of Peter Van Dyke's VDH issued computer, was to convert VDH clients and the contracts they renewed each year to their competing company, VVK.

5.     Defendants actions violate the Defend Trade Secrets Act codified as 18 U.S.C. § 1832.

6.     If Defendants are not immediately enjoined from further misappropriation of VDH trade secrets and conversion of VDH assets, Plaintiff will

K8245\433579\266275958.v5

continue to be irreparably harmed with the further loss of company value, good will, clients and employees.

## PARTIES, JURISDICTION, AND VENUE

7.      Plaintiff Van Dyke Horn, LLC ("VDH") is a limited liability company with its registered office located in Wayne County, Michigan.

8.      Defendant Peter Van Dyke is an individual residing at 4100 4th Street, Detroit, Michigan 48201, Wayne County, Michigan.

9.      Upon information and belief, Defendant Jamie Kaye Walters ("Walters") also resides and conducts business in the State of Michigan.

10.     Upon information and belief, Defendant Michael Sherman ("Sherman") resides in Charleston, South Carolina and conducts business in the State of Michigan.

11.     Defendant VVK PR & Creative, LLC is a Michigan limited liability company with its principal place located at 2937 E Grand Blvd, Detroit, Wayne County, Michigan 48202.

12.     Peter Van Dyke, Walters and Sherman are all members of VVK.

13.     Subject matter jurisdiction exists pursuant to 28 U.S.C. § 1331 for violations of the Defend Trade Secrets Act codified as 18 U.S.C. § 1832.

K8245\433579\266275958.v5

14.     Venue is proper in this Court under 28 U.S.C. § 1391(b)(2), in that a substantial part of the events giving rise to the claims occurred in this juridical district.

## FACTUAL ALLEGATIONS

15.     VDH is a well-established, 24-year-old public relations firm in Detroit. VDH has a strong reputation and numerous high-profile long-term clients.

16.     Marilyn Horn is a member and the President of VDH.

17.     Marilyn Horn has been in the public relations industry for over 20 years and has built a reputation in the industry as one of the most successful minority owned businesses in Southeastern Michigan.  Due in large part to her experience and relationships in the industry, Marilyn Horn has a 60% membership interest in VDH.

18.     In addition, Marilyn Horn is African- American and through her painstaking efforts, Marilyn secured approval for VDH as a minority certified business (Minority Business Enterprise or MBE).

19.     For years, VDH and Peter Van Dyke have reaped the financial rewards and benefits of the minority-owned business certification secured by Marilyn Horn. Indeed, numerous long-term VDH clients awarded VDH business due to the certification and due to Marilyn Horn.

20.     During the time in question, Defendant Peter Van Dyke was a member and the Chief Executive Officer of VDH until his resignation, with 24-hour notice,

effective March 4, 2022.[1]  While with VDH, Peter Van Dyke enjoyed and benefited from its minority certification and the client and industry relationships Marilyn Horn shared with him.

21.    Until March 4, 2022, Marilyn Horn and Defendant Van Dyke's relationship was governed by the VDH Operating Agreement.  **Exhibit A.**

22.    The VDH Operating Agreement provided for the rights and obligations of the members.  The VDH Operating Agreement prevented members from taking unilateral action on behalf of the company and from taking actions that create a potential conflict of interest between any member and VDH.

23.     While he was an officer of VDH, Van Dyke also had statutory and common-law fiduciary duties to VDH, including the duty of loyalty, honesty, care and good faith and fair dealing.

24.    Peter Van Dyke understood that VDH had trade secrets that needed to be protected while he was an officer and member of VDH.  In fact, he required certain key employees to sign employment agreements with restrictive covenants to keep them from soliciting employees and clients.  As for clients, Peter Van Dyke placed in these employment agreements the following language indicating the time and effort the Company invested in developing clients and that the client list is confidential:

---

[1] Upon his resignation, Peter Van Dyke transferred his membership interest back to the company.

K8245\433579\266275958.v5

> You further recognize that the Company has spent
> significant amounts of time and money developing a list
> of its clients, which list is not available to the general
> public, and that this list contains other information about
> the clients (including any clients that engage the Company
> for services during your employment) not available to the
> general public, and you have been privileged to this list.
> During the term of your employment, you shall not
> directly or indirectly (i) solicit for the purpose of
> providing, or otherwise induce the termination or non-
> renewal of, any business services like those performed by
> the Company . . .

**Exhibit B.**

25.    Several months ago, Peter Van Dyke was interested in bringing in new

partners to VDH, including Defendants Sherman and Walters.  To entice Sherman

and Walters to join VDH as owners, Defendant Van Dyke wanted to simply give

them a membership interest in VDH, diluting Marilyn Horn's equity interest to less

than majority and disqualifying VDH's MBE certification.

26.    His partner, Marilyn Horn, insisted that if they wanted to join the

company as members, Sherman and Walters must simply buy into the company for

fair value.

27.    Frustrated with not getting his way, Peter Van Dyke offered to buyout

Marilyn Horn's interest for $170,000.  This was rejected immediately by Marilyn

Horn because the offer was well below fair value, less than one times annual profits,

and insulting.

K8245\433579\266275958.v5

28.     Thereafter, Peter Van Dyke engaged a national valuation firm specializing in public relations firms, Prosper Group, to perform an independent valuation of the company should Sherman and Walters buy in and so that he and Marilyn Horn could explore his interest in the purchase of her membership interest in VDH.

29.     On January 11, 2022, the Prosper Group valuation was completed, and it valued VDH and Marilyn Horn's membership interest more than five (5) times higher than what Peter Van Dyke offered to pay Marilyn Horn for her ownership interest.

30.     When Peter Van Dyke didn't get his way, and instead of having Sherman and Walter's buy into the company or offering Marilyn Horn fair value for her interest, Peter Van Dyke set out on a course to try to force Horn to shut down the business so that he could take it all.  He stole clients, doctored client contracts, and misappropriated the trade secrets and other assets belonging to the company out from Marilyn Horn and VDH.

31.     Indeed, shortly after receiving the valuation, Peter Van Dyke secretly began to put into motion a plan to misappropriate the trade secrets and assets of VDH, including among other things the contracts, clients and employees of the company, with the help of Sherman and Walters, both of whom were vendors or employees of VDH, respectively.

32.     For weeks, while still an officer and member of VDH, Peter Van Dyke (along with Defendants Sherman and Walters) worked on creating a business plan for a new competing company that relied on immediately being able to transfer VDH clients and contracts (as well as employees) for his benefit and for the benefit of Sherman and Walters and to the detriment of VDH.  **Exhibit C.[2]**

33.     Defendants' business plan copied the business structure of VDH.  It identified the VDH clients by name, their contracts and pricing, and their projected revenue from those contracts.  **Exhibit C.**

34.     Defendants' business plan also identified VDH's key employees that Defendants' had either solicited or planned on soliciting for employment.  These key employees, including "Annmarie" were responsible for some of VDH's most important client relationships that Defendants planned on converting to their new enterprise.  **Exhibit C.**

35.     Peter Van Dyke took full advantage of his position as an officer of VDH to set up a competing operation as it provided him full access to the company's trade secrets.

36.     VDH trade secrets includes the following:

(a) The identity of its clients and their related contact information, needs, preferences, purchase history;

---

[2] Client names have been removed from the business plan as Plaintiff continues to hold the position that the identity of its clients is a trade secret and confidential.

K8245\433579\266275958.v5

    (b) Client contracts and pricing;

    (c) Financial information including, financial statements, tax returns, bank statements and the general ledger;

    (d) Vendor information including contacts, pricing and contracts; and

    (e) Employment Agreements with key employees with compensation, benefits and terms of employments.

37.    Just days before resigning from VDH, Peter Van Dyke secretly used a VDH computer and secretly uploaded the company's trade secrets, including dozens of complete client files and confidential business information, into two zip file drives and emailed them to his personal email address. **Exhibit D**.

38.    During his last days as an officer and member of VDH, Peter Van Dyke was also secretly recruiting VDH employees to join his venture and calling and visiting with VDH long-term clients to convince them to re-assign their contracts to him after he resigned from the company.  Upon information and belief, Peter Van Dyke was telling clients that VDH would be unable to support their contracts because he was taking the company's talent with him to his new company.

39.    On March 3, 2022, after six years with VDH, Peter Van Dyke submitted his resignation to Marilyn Horn providing one day of notice, declaring that his last day with VDH would be March 4, 2022.  **Exhibit E.**  The fact that Peter Van Dyke was only giving one day of notice was a red flag that he engaged in misdeeds that violated his fiduciary duty as well as common and statutory law.  As VDH and

Marilyn Horn would later find out, Peter Van Dyke had already set in motion and timed his departure in a shameful attempt to follow through on his previous attempt to shut down VDH and take it for his own.

40.    On his last day, March 4, 2022, Marilyn Horn approached Peter Van Dyke in the office and provided him with a Declaration Confirming Return of Property and Confidential Information ("Declaration").  Among other things the Declaration required Peter to confirm that he returned all Company property and trade secrets and did not retain copies of same:

> I, Peter Van Dyke, declare under penalty of perjury that I have returned to Company all property belonging to Company and all confidential and proprietary information and trade secrets (as defined below) belonging to Company or belonging to a Company customer or vendor that was in my possession, custody or control in my role as a sales representative for Company.  This includes, but is not limited to, all Company equipment I received from Company, as well as any marketing and sales material, samples, customer and vendor files, drawings, request for quotations, quotations, cost and pricing data, purchase orders, change orders, part and tooling approval documents and communications, and any other documents pertaining to Company's business or belonging to Company ("Confidential Information").
> I understand that in accordance with the Michigan Uniform Trade Secret Act, that "trade secret" means information, including a formula, pattern, compilation, program, device, method, technique, or process, that: (i) derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and (ii)

11

is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

I further declare that I have not kept copies or duplicates of any of Company's Confidential Information or trade secrets either in hard copy or in an electronic format. The statements in this Declaration are true to the best of my knowledge, information and belief.

**Exhibit F.**

41.    Shockingly, Peter Van Dyke refused to sign the Declaration, which is yet another red flag that he engaged in misdeeds that violated his fiduciary duty as an officer as well as common and statutory law.  If Peter Van Dyke had nothing to fear and had not taken VDH property, he would have signed the Declaration.  Of course, VDH would later discover with the help of IT professionals that Peter Van Dyke refused to sign the Declaration because he had already diverted and was using VDH's trade secrets in advance of his resignation.

42.    Moreover, on his way out the door for the last time on March 4, 2022, Peter Van Dyke was overheard smugly telling employees they would always have a job with him, attempting to foreshadow that his scheme would trigger the decline of VDH.

43.    Within hours of his departure, long-term clients of VDH began contacting VDH and asking it to transfer their work and contracts to Defendant Van Dyke. **Exhibit G.**  Surprisingly and counter to industry practices, the clients did not ask to gather and transfer their files as Peter Van Dyke had already stolen them from

VDH.  This immediate turn-over of clients is clear evidence that Peter Van Dyke engaged in misdeeds that violated his fiduciary duty as an officer as well as common and statutory law.  No competitor could take these clients and their contracts overnight without breaching fiduciary duties and misappropriating trade secrets.

44.    It took time for VDH to uncover the depths of Peter Van Dyke's unlawful actions and those of the other Defendants because he had tried to destroy evidence of his actions and activities, including but not limited to his communications with clients and employees.   More specifically, Peter Van Dyke attempted to permanently delete his digital footprint before handing in his VDH issued computer on his last day.  The fact that he attempted to delete his digital footprint and destroy evidence, as well as delete VDH work product and client files, is another red flag that he was covering up unlawful conduct and a clear breach of his fiduciary duty as both an officer and employee. At a minimum, this draws a negative inference that the digital data would have pointed to his breaches of the VDH Operating Agreement, breaches of his fiduciary duty, conversion, misappropriation of trade secrets and other tortious activities.

45.    After weeks of working to recover Defendant Van Dyke's digital footprint from his company-issued computer, VDH's information technology team was recently able to uncover some of the many actions he took to steal the company while still employed by VDH, including but not limited to:

13

K8245\433579\266275958.v5

     a. Creating a business plan for Defendant VVK which substantially mirrored VDH's business model, talent, employees, client list, contracts and revenue (**Exhibit C**);

     b. Copying VDH's contracts with its clients and substituting "VVK" for "VDH;" in fact, Defendant Van Dyke simply replaced VDH with VVK in one contract and saved it on the VDH client drive, and in another case forgot to change "VDH" to "VVK" in another of the plagarized contracts, which prompted VDH's former client to accidently email him at his former VDH email address asking him to make the change;

     c. Copying VDH's contracts with its employees and sending them to himself;

     d. Destroying or failing to produce standard employment agreements, as was his responsibility as CEO of VDH, for former employees Jamie Kay Walters and Craig Fahle, who conspired to join Peter at VVK;

     e. Copying two large zip folders of VDH's client files and contracts and sending them to himself; and

     f. Copying VDH's website template to create a new one for VVK.

46. Further, Defendant Van Dyke accessed the VDH server *after* his departure from the company and attempted to make changes in one of VDH's contracts with its clients, making himself the primary relationship partner.

47. Without misusing VDH trade secrets, which includes client information such as contract terms, contact information, strategies, in-process work product, and past, current and future needs, Defendant Van Dyke could not have seamlessly

resigned from VDH and had several of VDH clients want to transfer to him within hours.

48.     Nor could Defendants launch their new venture, VVK PR & Creative, LLC, with "$2 million in annual revenue" to start. **Exhibit H**, Apr. 25, 2022 Crain's Article.

49.     Additionally, Defendants would not have been able to usurp VDH's clients and employees without knowing the contents of VDH's contracts with its clients and employees, which constitute protected trade secrets.

50.     VDH has spent many years developing and maintaining confidential and proprietary information as it relates to the identity of its long-term clients, client needs, client contractual terms and client purchase history, among other things.  And, VDH has spent time recruiting and training its employees and has, over time, entrusted them with the care and service of its long-term client relationships and contracts.   VDH maintains confidentiality over this and the vast majority of its business information. The information VDH obtains about client needs and how to address those needs is a key component of its ability to compete.

51.     As Chief Executive Officer of VDH, Defendant had access to VDH's confidential and proprietary information and trade secrets ("Trade Secrets"), including but not limited to: (a) client contact information; (b) past, current and planned client public relations programs, strategies and budgets; (c) VDH's client

pricing, needs, and contracts; (d) VDH's vendors used on client projects; (e) employee compensation, benefits and employment terms; and (f) prospective employees and compensation terms, including individuals that Defendant Van Dyke interviewed as VDH CEO and then tried to convince to rescind their acceptance of their VDH offer to join VVK.

52. VDH's competitors do not have access to its Trade Secrets and if they did, they would find this information valuable and could unfairly compete with VDH by using its Trade Secrets. Defendant undoubtedly used VDH Trade Secrets to make offers that appealed to VDH's clients and convinced them to abandon VDH and follow him.

53. To help preserve confidentiality, VDH has certain key employees sign confidentiality and/or non-solicitation agreements. In addition to having certain key employees sign confidentiality agreements, VDH also does the following to protect its confidential and proprietary information and trade secrets with non-disclosure agreements and/or provisions in its contracts, employs an Information Systems team, which monitors and seeks to improve security, reliability, availability, and integrity of VDH systems, which store ACE's confidential, proprietary and trade secret information, by providing employees Company-issued computers with appropriate security protections, and requires all employees to password protect their Company-issued computer.

K8245\433579\266275958.v5

54.     Without misappropriating VDH Trade Secrets both while he was still an officer and upon his resignation, Defendant Van Dyke would not have been able to instantly divert VDH clients away from the company and convince these clients to follow him to his new business.

55.     Unfortunately, Defendant destroyed much of the relevant and critical evidence of his activities and that must be construed against him.

56.     In addition to breaching his fiduciary duties to VDH, Defendant Van Dyke's actions violate the VDH Operating Agreement. Specifically, Defendant has violated the following provision prior to assigning his ownership interest back to the Company:

> **6.2    ACTIONS    REQUIRING    UNANIMOUS CONSENT OF MEMBERS.**  No Member shall have the authority to, and covenants and agrees that such Member shall not, do any of the following acts on behalf of the Company without the vote and approval of a Supermajority in Interest:
>
> (a)    Enter into a transaction involving an actual or potential conflict of interest between a Member and the Company;
>
> * * *
>
> (b)    Do any act in contravention of this Agreement or which would make it impossible or unreasonably burdensome to carry out the business of the Company.

**Exhibit A.**

57.     Defendants Sherman, Walters and VVK worked in concert with Defendant Van Dyke and conspired to misappropriate VDH's trade secrets.  Their goal was to immediately take all valuable assets from VDH, including but not limited to long-time clients and employees, by using VDH's trade secrets to unfairly compete. Their goal was also to force Marilyn Horn to shut down VDH as soon as possible.

58.     Marilyn Horn, however, did not shut down VDH upon the resignation of Peter Van Dyke, but continued the business despite the immediate loss of some long-term clients and employees that joined Defendants competing company.  As if to harass her, on March 18, 2022, the same day they filed articles of organization for VKK, Defendant Sherman sent Marilyn Horn an obscene email showcasing the name of their competing company in the form of multiple male genitals.  The email is too graphic and disturbing to attach to this pleading.

59.     There is ample evidence to demonstrate that Defendants Van Dyke, Sherman and Walters organized and created VVK for the purpose of soliciting and interfering with VDH using VDH's trade secrets and converting its clients, employees, contracts and revenue for their benefit and for the benefit of VVK without paying for them and without enduring the investment in time and resources any other competitor would take on to develop business.

60.     Defendants fingerprints and are all over the VVK business plan as their names and roles in the scheme appear in several places and Defendant Walters was actively working in the VDH business and on VDH clients alongside Defendant Van Dyke and did not resign concurrent with Defendant Van Dyke despite simultaneously stealing clients and building the VVK business.

61.     Defendants knowingly solicited and now employ VDH former key employees who have non-solicitation in their employment agreements that prevent them from working for with VDH clients on behalf of VVK.  For example, in their business plan Defendants identified VDH employee "Annmarie".  Using trade secrets, Defendants knew they needed "Annmarie" to join them because she was responsible for and the relationship person of certain long-term VDH clients. Without her, it would be more difficult to convert certain VDH clients.  Annmarie's VDH employment agreement, signed by Defendant Van Dyke while at VDH, prevents her from soliciting directly or indirectly employees or clients.  **Exhibit B.**

62.     Defendants' actions constitute a misappropriation of trade secrets, conversion and tortious interference with VDH contracts and business relationships or expectancies.

63.     Plaintiffs will continue to suffer irreparable harm if Defendant is not immediately enjoined from his misconduct.

## COUNT I – BREACH OF FIDUCIARY DUTY

### *(PETER VAN DYKE)*

64.     Plaintiff incorporates by reference all preceding paragraphs.

65.     As an officer of VDH, Defendant Van Dyke had a common-law and statutory fiduciary duty of loyalty, care honesty, good faith and fair dealing.

66.     As set forth above, Defendant Van Dyke breached his fiduciary duty.

67.     As a direct and proximate cause of Defendant Van Dyke's breach of fiduciary duty, Plaintiff has suffered damages in excess of $25,000.

## COUNT II – BREACH OF CONTRACT/OPERATING AGREEMENT

### *(PETER VAN DYKE)*

68.     Plaintiff incorporates by reference all preceding paragraphs.

69.     The Parties Operating Agreement provides the term that govern their rights and obligations as members of VDH.

70.     As set forth above, Defendant Van Dyke breached the Operating Agreement prior to assigning his ownership interest to the Company effective March 3, 2022

71.     As a direct and proximate cause of Defendants' breach, Plaintiff has suffered damages in excess of $25,000.

K8245\433579\266275958.v5

## COUNT III – TORTIOUS INTERFERENCE WITH
## BUSINESS EXPECTANCY AND CONTRACT

### *(ALL DEFENDANTS)*

72.     Plaintiff incorporates by reference all preceding paragraphs.

73.     VDH enjoys valid business relationships and expectations with its clients and employees, from which Defendants have directly and/or indirectly attempted to, and will continue to, unfairly solicit and usurp for business.

74.     These business relationships and expectancies have a reasonable likelihood of future economic benefit to Plaintiff.

75.     Defendants knew of these business relationships and expectancies.

76.     Defendants have intentionally and improperly interfered with and will continue to intentionally and improperly interfere with VDH's business relationships and expectations in numerous ways, including, but not limited to, using VDH's Trade Secrets to develop and continue to develop relationships with VDH's clients and employees.

77.     The misappropriation of Plaintiff's Trade Secrets is a per se wrongful act by Defendants.

78.     Defendants have wrongly induced or caused or will continue to induce or cause VDH's clients to divert business opportunities and expectations from VDH.

79.     Defendants have acted with malice for the purpose of invading the business relationships or expectations of VDH.

80.     There was a reasonable likelihood or probability that the business relationships and business expectancies would have sustained as desired by VDH absent the tortious inference by Defendants.

81.     As a result of Defendants' improper, illegal, fraudulent, and intentional actions, VDH's business relationships and business expectancies have been disrupted.

82.     VDH has been and will continue to be injured by Defendants' acts of tortious interference.

83.     As a direct and proximate result of Defendants' wrongful conduct, VDH has suffered economic injury in excess of $25,000.00, loss of goodwill, harm to its business reputation, loss of esteem and standing in the community, and loss of business opportunities.

## COUNT IV – MISAPPROPRIATION OF TRADE SECRETS

### *(ALL DEFENDANTS)*

84.     Plaintiff incorporates by reference all preceding paragraphs.

85.     VDH's Trade Secrets include employee compensation and benefit information, employee/client relationship information, client identity, client contract terms andclient needs, strategies, files and work-in-process materials, among other things, which would be valuable in the hands of its competitors.

86.     These VDH Trade Secrets have given VDH an advantage over competitors who do not have access to them.

87.     These VDH Trade Secrets are not known to VDH's competitors.

88.     These VDH Trade Secrets are only known by VDH's employees who have a need to know the information.

89.     Plaintiff VDH takes among other actions the following measures to protect its Trade Secrets: password protections, limited access, confidentiality agreements or non-disclosure agreements and non-solicitation agreements with its key employees.

90.     This information is of great value to Plaintiff VDH because it invested a great deal of time and money into obtaining this information and maintaining its relationships with its clients.  Competitors would find it valuable because they could quickly identify companies that utilize public relations and the specific terms and conditions under which they engage VDH so that they could underbid and/or plagiarize work product.  It takes a substantial amount of time, energy and money to identify a prospect and to transition those prospects into clients. It also takes a great deal of time, energy and money to keep those clients and the good will established with those clients.

K8245\433579\266275958.v5

91.     Defendants misappropriated Plaintiff VDH's Trade Secrets by using trade secrets and confidential and proprietary information to solicit Plaintiff VDH's long-term clients and client business relationships and expectancies.

92.     Defendants are jointly and severally liable for the damages VDH has sustained.

93.     As a direct and proximate cause of Defendants' actions, Plaintiff VDH has been irreparably harmed and damaged in excess of $25,000.

## COUNT V – VIOLATIONS OF THE DEFEND THE TRADE SECRETS ACT

### *(ALL DEFENDANTS)*

94.     Plaintiff incorporates by reference all preceding paragraphs.

95.     At all relevant times, VDH has been engaged in interstate commerce for providing public relations and marketing services.

96.     Pursuant to his prior position with VDH, Defendant Van Dyke had access to and was in possession of Protected Trade Secret Information and other confidential and proprietary information belonging to VDH, including, but not limited to, VDH's employment contracts, income statements and balance sheets, pricing and cost information, client contracts, and vendor relationships among other things.

97.     Concurrent with his departure from VDH, Defendant Van Dyke secretly stole VDH employment contracts, financial statements, pricing and cost

information, client contracts and confidential client files and work-in-process and retains them as of the date of this filing.

98.    This information constitutes "trade secret" information within the meaning of 18 U.S.C. 1839.

99.    Since Defendant Van Dyke stole VDH's Protected Trade Secret Information, he, along with Defendants Michael Sherman, Jamie Kaye Walters, and VVK have been unlawfully using this information to target VDH's clients and employees and copy its business model in violation of 18 U.S.C. 1832.

100.    VDH's Protected Trade Secret Information and other confidential and proprietary information has commercial value and has given VDH an opportunity to obtain an advantage over its competitors.

101.    VDH has devoted substantial resources to the procurement of its Protected Trade Secret Information and other confidential and proprietary information.

102.    Defendants' conduct constitutes both an actual and threatened unauthorized use and/or a disclosure of Protected Trade Secret Information and other confidential and proprietary information belonging to VDH.

103.    Defendants' conduct willfully and egregiously violateds VDH client contracts and confidentialty provisions, in many cases contracts signed by Defendant

Van Dyke, causing significant harm to VDH and its clients, and tort liability for breach of contract.

104.   VDH took reasonable steps to preserve the secrecy of its Protected Trade Secret Information and other confidential and proprietary information, including, among other things, using locked file cabinets, locked drawers, using computer passwords to restrict access to Secret Information and other confidential and proprietary information contained on VDH's computers and internal servers. VDH also used non-solicitation provisions in its employment agreement with key employees.

105.   Defendants have wrongfully and improperly utilized VDH's Protected Trade Secret Information and other confidential and proprietary information knowing that the Protected Trade Secret Information and other confidential and proprietary information were the property of VDH and knowing that the use of the Protected Trade Secret Information and other confidential and proprietary information belonging to VDH was unauthorized.

106.   Defendants knew that VDH derived economic value from its Protected Trade Secret Information and other confidential and proprietary information and that VDH made reasonable efforts to maintain secrecy of its Protected Trade Secret Information and other confidential and proprietary information.

K8245\433579\266275958.v5

107.    Defendants continue to use VDH's Protected Trade Secret Information and other confidential and proprietary information, which Defendants wrongfully and improperly acquired for their own gain.

108.    Defendants' unauthorized use and possession of VDH's Protected Trade Secret Information and other confidential and proprietary information constitutes misappropriation within the meaning of 18 U.S.C. 1839.

109.    As a direct and proximate result of Defendants' wrongful use of VDH's Protected Trade Secret Information and other confidential and proprietary information, VDH has sustained and continues to sustain damages including, but not limited to, loss of profits, loss of customer relationships, loss of good will, and loss of employees, in excess of $750,000 per year.

110.    Defendants' misappropriation of VDH's Protected Trade Secret Information and other confidential and proprietary information has unjustly enriched Defendants because Defendants are using such information to advance their position in the industry without the costs and efforts associated with the creation of the same.

111.    Defendants are jointly and severally liable for the damages VDH has sustained.

## COUNT VI – COMMON LAW CONVERSION/ STATUTORY CONVERSION

### *(ALL DEFENDANTS)*

112.   Plaintiffs incorporate by reference all preceding paragraphs.

113.   The tort of conversion is any distinct act of dominion wrongfully exerted over another's personal property in denial of or inconsistent with the rights therein.

114.   Plaintiff VHD is the owner of certain protected Trade Secrets, including, but not limited to, VDH's client contact information, client contracts, client strategies, vendor information and pricing, among other things.

115.   Defendants always knew that VDH's protected Trade Secrets and other items was the sole property of VDH.

116.   VDH has demanded and requested that Defendants acknowledge his return of protected Trade Secrets and items to VDH. Defendant refused to make this acknowledgement and continues to possess the stolen information and doctored contracts.

117.   Despite demands for the return of VDH protected Trade Secrets and other items, Defendants refuses to turn over possession.

118.   Defendants' possession and use of VDH's protected Trade Secrets and other items is without permission and without any lawful right to do so.

119.    Defendants' continued possession and use of VDH's protected Trade Secrets and other items constitutes common law conversion.

120.    Under MCL 600.2919a(1), VDH "may recover 3 times the amount of actual damages sustained, plus costs and reasonable attorney fees: [if damaged as a result of] (a) Another person's stealing or embezzling property or converting property to the other person's own use. [Or] (b) Another person's buying, receiving, possessing, concealing, or aiding in the concealment of stolen, embezzled, or converted property when the person buying, receiving, possessing, concealing, or aiding in the concealment of stolen, embezzled, or converted property knew that the property was stolen, embezzled, or converted." MCL 600.2919a(1) (formatting omitted)

121.    As a direct and proximate cause of Defendants' improper actions and conversion, VDH has suffered damaged in excess of $750,000 a year, which amounts to over $3 million over the span of 5 years.

122.    Defendants are jointly and severally liable for the damages VDH has sustained.

WHEREFORE, Plaintiff VDH, requests that this Honorable Court order the following relief:

        A.    Temporary, preliminary and permanent injunctive relief, preventing Defendants from using any trade secret information, confidential information, and

proprietary information belonging to VDH and ordering Defendants to return it to VDH;

B.      Temporary, preliminary and permanent injunctive relief, preventing Defendants from contacting or hiring any of VDH's past, current, or prospective employees;

C.      Temporary, preliminary and permanent injunctive relief, preventing Defendants from any contact with or solicitation of any of VDH's clients;

D.      Temporary, preliminary and permanent injunctive relief, preventing Defendants from making disparaging and/or defamatory remarks or comments about VDH or Horn;

E.      An award of damages against Defendants in an amount to be determined, including treble damages, arising from Defendants' use of trade secret information, confidential information, and proprietary information belonging to VDH;

F.      An award of legal fees, costs, and interest arising from Defendants' use of trade secret information, confidential information, and proprietary information belonging to VDH; and

G.      All such other relief as this Court may deem just, equitable, or appropriate under the circumstances.

K8245\433579\266275958.v5

## <u>VERIFICATION</u>

I, Marilyn Horn, have personal knowledge of the facts in this Verified Complaint and I am competent to testify to these facts if called upon to do so.  To the best of my knowledge, belief, and understanding the factual allegations contained in this Verified Complaint are true and accurate.


_____
Marilyn Horn



Respectfully Submitted,

CLARK HILL PLC


*/s/ Linda M. Watson*
REGINALD TURNER (P45043)
LINDA M. WATSON (P45320)
MAGY SHENOUDA (P85576)
Clark Hill PLC
151 S. Old Woodward, Suite 200
Birmingham, Michigan 48009
(248) 988-5881
Attorneys for Plaintiff

Date: May 24, 2022

## **DEMAND FOR JURY TRIAL**

NOW COME Plaintiffs, by and though their attorneys, Clark Hill PLC, and hereby demand a trial by jury in the above-entitled cause.

Respectfully Submitted,

CLARK HILL PLC

*/s/ Linda M. Watson*
REGINALD TURNER (P45043)
LINDA M. WATSON (P45320)
MAGY SHENOUDA (P85576)
Clark Hill PLC
151 S. Old Woodward, Suite 200
Birmingham, Michigan 48009
(248) 988-5881
Attorneys for Plaintiff

Date: May 24, 2022

K8245\433579\266275958.v5