# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

VAN DYKE HORN, LLC,

        Plaintiff,               Case No. 2:22-cv-11141

v.                                Hon. Shalina D. Kumar

PETER VAN DYKE, MICHAEL
SHERMAN, JAMIE KAYE WALTERS,
and VVK PR & CREATIVE, LLC,

        Defendants.

_____/

# RESPONSE IN OPPOSITION TO PLAINTIFF'S MOTION
# FOR TEMPORARY RESTRAINING ORDER, ORDER TO
# <u>SHOW CAUSE, AND PRELIMINARY INJUNCTION</u>

# TABLE OF CONTENTS

STATEMENT OF ISSUES PRESENTED.................................................................iv

CONTROLLING LEGAL AUTHORITY..................................................................v

STATEMENT REGARDING LACK OF COMPLIANCE WITH LOCAL
    RULE 7.1 ..............................................................................................................vi

I.      INTRODUCTION.................................................................................1

II.    FACTUAL SUMMARY........................................................................2

        A.    Peter Van Dyke's Public Relations Career ...................................2

        B.    VDH Explores Merger Options To Accommodate
              Ms. Horn's Desire To Retire.........................................................4

        C.    Peter Van Dyke And Ms. Horn Negotiate For The Sale
              Of Her Interests in VDH ...............................................................7

        D.    Peter Van Dyke Leaves VDH ........................................................9

        E.    The Individual Defendants Begin VVK PR & Creative...........12

III.   VDH IS NOT ENTITLED TO INJUNCTIVE RELIEF....................13

        A.    Controlling Legal Principles ......................................................13

        B.    VDH Does Not Have A Likelihood Of Success On The
              Merits .........................................................................................14

        C.    VDH Has Not Suffered Irreparable Harm ................................19

        D.    An Injunction Does Not Serve The Public Interest .................22

        E.    The Balance Of Harms Favors Defendants ..............................22

IV.   CONCLUSION ...................................................................................24

# INDEX OF AUTHORITIES

## Cases:

*Apex Tool Grp., LLC v. Wessels*,
   199 F. Supp. 3d 599 (E.D. Mich. 2015) .......................................................13

*CDI Energy Servs. v. W. River Pumps, Inc.*,
   567 F.3d 398 (8th Cir. 2009) .......................................................................23

*Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*,
   511 F.3d 535 (6th Cir. 2007) .......................................................................13

*CMI Int'l, Inc. v. Intermet Int'l Corp.*,
   649 NW2d 808 (Mich. Ct. App. 2002).........................................................16

*Corning, Inc. v. PicVue Elec., Ltd.*,
   365 F.3d 156 (2d Cir. 2004) ...................................................................v, 16

*D.T. v. Sumner Cty. Schs.*,
   942 F.3d 324 (6th Cir. 2019) .......................................................................19

*DTC Energy Grp., Inc. v. Hirschfeld*,
   912 F.3d 1263 (10th Cir. 2018) ...................................................................21

*Dura Global Technologies, Inc. v. Magna Donnelly Corp.*,
   2008 WL 2064516 (E.D. Mich. May 14, 2008) ..................................... 14-15

*Hacker v. Federal Bureau of Prisons*,
   2006 WL 2559792 (E.D. Mich. Sep. 1, 2006) .............................................19

*Kubik, Inc. v. Hull*,
   224 N.W.2d 80 (Mich. Ct. App. 1974).........................................................14

*Leary v. Deschner*,
   228 F.3d 729 (6th Cir. 2000) .......................................................................14

*Liberty Coins, LLC v. Goodman*,
   748 F.3d 682 (6th Cir. 2014) .......................................................................22

*Lucero v. Detroit Pub. Sch.*,
    160 F. Supp. 2d 767 (E.D. Mich. 2001) ...................................................19, 20

*Memphis A. Philip Randolph Ins. v. Hargett*,
    978 F.3d 378 (6th Cir. 2020) ....................................................................v, 19

*Merrill Lynch, Pierce, Fenner & Smith Inc. v. E.F. Hutton & Co.*,
    403 F. Supp. 336 (E.D. Mich. 1975) ............................................................21

*NE. Ohio Coal. for Homeless v. Husted*,
    696 F.3d 580 (6th Cir. 2012) ........................................................................14

*Overstreet v. Lexington-Fayette Urb. Cty. Gov't*,
    305 F.3d 566 (6th Cir. 2002) ...............................................................v, 14, 21

*Patio Enclosures, Inc. v. Herbst*,
    39 F. App'x 964 (6th Cir. 2002) ...................................................................19

*Prime Therapeutics LLC v. Beatty*,
    354 F. Supp. 3d 957 (D. Minn. 2018) ..........................................................21

*Quantum Sail Design Group, LLC v. Jannie Reuvers Sails, Ltd.*,
    2015 WL 404393 (W.D. Mich. Jan. 29, 2015)..............................................14

**Rules:**

18 U.S.C. § 1836(b)(3)(A)(i)(I) ...............................................................16
18 U.S.C. § 1839....................................................................................14
18 U.S.C. § 1839(3)(A)...........................................................................14

## <u>STATEMENT OF ISSUES PRESENTED</u>

1.  Whether VDH's Ex-Parte Emergency Motion for Temporary Restraining Order, Order to Show Cause, and Preliminary Injunction (the "Motion") should be denied because VDH failed to demonstrate any likelihood of success on the merits for its claim brought under the Defend Trade Secrets Act.

    Defendants say "yes"

2.  Whether the Motion should be denied because VDH, in waiting to bring this action for nearly three months, failed to demonstrate any immediate irreparable harm.

    Defendants say "yes"

3.  Whether the public interest favors rejection of VDH's Motion because the public interest does not favor frivolous, unsupported Motions attempting to prevent individuals from working in their chosen fields.

    Defendants say "yes"

4.  Whether the balance of harms favors rejection of VDH's Motion because VDH has not suffered, and will not suffer, any cognizable injury in the absence of injunctive relief.

    Defendants say "yes"

## **CONTROLLING LEGAL AUTHORITY**

*Memphis A. Philip Randolph Ins. v. Hargett*, 978 F.3d 378 (6th Cir. 2020)

*Overstreet v. Lexington-Fayette Urb. Cty. Gov't*, 305 F.3d 566 (6th Cir. 2002)

*Corning, Inc. v. PicVue Elec., Ltd.*, 365 F.3d 156 (2d Cir. 2004)

## <u>STATEMENT REGARDING LACK<br>OF COMPLIANCE WITH LOCAL RULE 7.1</u>

Local Rule 7.1(a) states that a "movant must ascertain whether the contemplated motion . . . will be opposed." Despite knowing that Defendants were represented by undersigned counsel since at least February 2022, VDH never requested concurrence in the Motion. Moreover, VDH's Motion does not contain a concise statement of the issues presented or controlling/most appropriate authorities for the relief sought.

## I.  __INTRODUCTION__

Based on nothing more than conjecture and speculation, Plaintiff Van Dyke Horn Public Relations, LLC[1] ("VDH") seeks the extraordinary remedy of a preliminary injunction. Despite the fact that nearly ninety days have passed since Peter Van Dyke resigned from VDH and returned his ownership interest to VDH for nothing more than $1, VDH has taken no action whatsoever to protect its interests. It has never demanded the return of any alleged "trade secrets" taken by the Defendants. It has presented this Court with no forensic computer evidence that would support its absurd allegations, and it has not identified any concrete trade secrets that have actually been misappropriated. The scant documents attached to its Complaint do not support the claim that Defendants are using anything other than their own knowledge and industry expertise to set up their competing public relations firm. As set forth in detail below, VDH failed to demonstrate that it has been irreparably injured or that it has a likelihood of success on the merits. For these reasons, and all those set forth below, Defendants respectfully request that this Court

---

[1]     Plaintiff somehow failed to file this action under its correct legal name: "Van Dyke Horn Public Relations, LLC." (ECF No. 1-2 at §1.3.) No Michigan entity is actually named "Van Dyke Horn, LLC." This oversight appears to be immaterial as Plaintiff has, as of May 27, 2022, filed a certificate renaming its company "98Forward, LLC." For ease of reference, Defendants will refer to Plaintiff herein simply as "VDH".

enter an Order dissolving the *Ex Parte* Temporary Restraining Order and denying VDH's request for a Preliminary Injunction.

## II.   FACTUAL SUMMARY

### A.   Peter Van Dyke's Public Relations Career

Peter Van Dyke has worked in communications and public relations in Detroit since 2002.[2] Given his two decades of experience in public relations, he is intimately familiar with the salaries paid to public relations employees, and the ways in which public relations companies charge their clients. During his time as both an employee and executive of public relations firms, he developed a significant understanding for the business of each of his clients. In his role, he works very hard to understand his customers' industries, their individual businesses, and their needs for public relations services. This knowledge is not tied to any specific client file, document, or strategy, even though he has a deep understanding of the business needs of any client he represents.

In 2006, Mr. Van Dyke began working for Berg Muirhead & Associates ("Berg Muirhead"). In 2013, he became a partner of Berg Muirhead, where he was given great responsibility with regard to that company's operations, and significant

---

[2]      This Factual Summary is verified by the Declarations of Peter Van Dyke, **Ex. A**, Jamie Kaye Walters, **Ex. B**, and Michael Sherman, **Ex. C**.

client-facing responsibility. By 2013, he had developed his own large book of public relations clients.

On January 1, 2016, Marilyn Horn and Mr. Van Dyke acquired the assets of Berg Muirhead and began VDH. At the time of acquisition, Berg Muirhead had annual revenues of roughly $750,000. The purchase price for the entirety of the assets of Berg Muirhead in 2016 was $200,000. Mr. Van Dyke and Ms. Horn never signed restrictive covenants limiting their right to compete with VDH or solicit VDH employees or clients.

From 2016 until March 4, 2022, Mr. Van Dyke was the Chief Executive Officer of VDH. In this role, he was responsible for meeting with clients and negotiating client contracts. He was designated as the responsible contact at VDH in all client contracts. During that same time, Ms. Horn was not involved in meeting with prospective clients or negotiating client contractual relationships. Rather, Ms. Horn maintained responsibility for human resources (including maintaining employee files, managing benefit and payment systems, and securing employee contracts), financial reporting and management, and payment of vendors.

When VDH formed in 2016, its clients were all originally Berg Muirhead clients. VDH was certified as a minority-owned business because Ms. Horn owned 60% of the equity of the company. The majority of the VDH clients, however, were not tied to its status as a certified minority-owned business. Regardless of their

3

reasons for choosing VDH, all of the Berg Muirhead clients were clients that Mr. Van Dyke had developed deep business and personal relationships since 2006. Similarly, given his role as the client-facing representative of VDH, Mr. Van Dyke developed deep business, and often personal, relationships with the VDH clients. Throughout his work at Berg Muirhead and VDH, Mr. Van Dyke's business and personal relationships were often not confidential, as they were readily ascertainable from the VDH website, publicly available news reports, or on social media such as LinkedIn or Facebook.[3]

### B.   VDH Explores Merger Options To Accommodate Ms. Horn's Desire To Retire

In late 2020 and early 2021, Ms. Horn began a discussion with Mr. Van Dyke the prospects for her retirement. As Ms. Horn was nearing retirement age and Mr. Van Dyke was not, the two began to work on a succession plan for VDH. In early 2021, in an effort to develop that succession plan, VDH began to explore merger negotiations with Velocity Cow, LLC ("Velocity Cow"). Velocity Cow was a video production and editing company that had been a vendor to VDH and its clients. In 2021 Velocity Cow was owned by Michael Sherman. Ms. Horn and

---

[3]   Interestingly, since Mr. Van Dyke's resignation, VDH left Mr. Van Dyke as the administrator of its own social media pages for weeks. Mr. Van Dyke still, to this day, is the administrator of two of VDH's client's social media pages. In either instance, Mr. Van Dyke has not utilized this access in order to seize alleged "trade secrets" of VDH, or to interfere in any way with VDH's business.

Mr. Van Dyke believed that its merger with VDH would significantly enhance the services that could be offered by VDH.

The VDH-Velocity Cow merger discussions also included Jamie Kaye Walters. Ms. Walters had been the creative services and programming director for the NBC television affiliate in Detroit. Ms. Walters had also been a partner in Velocity Cow until 2018, and she could add significant marketing experience to the proposed merged entity. Further Ms. Walters is African-American, so her partnership in the new entity also was intended to allow the company to remain certified as minority-owned after Ms. Horn's retirement.

Throughout 2021, VDH, Velocity Cow, and Ms. Walters explored many different options for ownership and management of any new entity that was formed. During these negotiations, VDH shared significant financial and employee information with Ms. Walters and Mr. Sherman. VDH never told Mr. Sherman or Ms. Walters that any information to which they were exposed constituted a "trade secret", and VDH did not otherwise enter into any agreements to restrict their use of that information. Ms. Horn was aware of these disclosures and never objected to them during the merger discussions and never required any confidentiality agreement to be executed.

Throughout these discussions, VDH also employed the services of a management strategy consultant, David Haviland. Although VDH disclosed

significant financial and employee information to Mr. Haviland, VDH did not have Mr. Haviland execute any agreement. VDH did not advise Mr. Haviland that the VDH information to which he was exposed (including client information and client contracts) was confidential or contained anything that VDH considered to be a trade secret. Ms. Horn and Mr. Van Dyke would routinely share detailed financial, client, and employee information with Mr. Haviland without advising him that any of the information he received should be considered confidential.

In April 2021, Velocity Cow, through Mr. Sherman, Ms. Walters, and VDH, through Ms. Horn and Mr. Van Dyke, agreed in principal to a memorandum of understanding regarding a merger and restructuring for the companies. **Ex. E**, Memorandum of Understanding. The April 2021 memorandum of understanding did not have Velocity Cow or Ms. Walters contributing any equity because of the revenue brought to the company by Velocity Cow, as well as the significant experience brought by Ms. Walters.

Based on everyone's good-faith agreement to the April 2021 memorandum, Ms. Walters submitted her resignation to WDIV with 10-weeks' notice. After she submitted her resignation, all parties tried to reach a final agreement as to the VDH-Velocity Cow merger. During that time, Ms. Horn decided that she would like to change her retirement date from five years into the future to about two-and-a-half years, during which time she wanted guaranteed employment. All the other parties

agreed to that request. Unfortunately, after that request, the negotiations stagnated, and Ms. Horn seemed unwilling or uninterested in moving them forward.

### C.   Peter Van Dyke And Ms. Horn Negotiate For The Sale Of Her Interests in VDH

Recognizing Ms. Horn's apparent disinterest in continuing to pursue merger negotiations, in October 2021, Mr. Van Dyke made Ms. Horn an offer of $170,000 for her interest. This offer was based on the same rationale she used to give Berg Muirhead a dramatically reduced value for their assets. Given that this amount was close to what was paid for 100% of Berg Muirhead's assets, and given that Ms. Horn only owned 60% of the Company, Mr. Van Dyke believed this to be a fair offer. Approximately three weeks later, Ms. Horn declined this offer by e-mail. In her e-mail, she thanked Mr. Van Dyke for his partnership, and she certainly did not indicate that she was somehow offended by the offer.

Soon thereafter, Ms. Horn and Mr. Van Dyke agreed that they would get a third-party valuation of VDH in order to continue the negotiations. VDH hired Prosper Group—a valuation firm for public relations firms—for the valuation. Prosper Group conducted the valuation in the later part of 2021, and it concluded that the going concern value was between $980,954 and $1,219,625. **Ex. F.** Mr. Van Dyke believed the valuation was not sustainable because it operated on the premise that Ms. Horn would continue in her work at VDH as a going concern, and it presumed there would be no investment in staff or systems at VDH. Such a valuation

seemed too high to Mr. Van Dyke because VDH had senior staff resigning or retiring, which began to put significant strain on his ability to lead the company after a buy-out of Ms. Horn.

Despite these reservations regarding the valuation, in January 2022, Mr. Van Dyke increased his offer to Ms. Horn to $300,000 for her interest in VDH. **Ex. P**. Ms. Horn never accepted this offer, and merely advised Mr. Van Dyke that he should only speak with her attorney with regard to this matter. This was the last time Ms. Horn and Mr. Van Dyke ever spoke about the future of VDH.

During the months-long buy-out negotiations between Mr. Van Dyke and Ms. Horn, the VDH-Velocity Cow merger was effectively put on hold. On February 9, 2022, Mr. Sherman sent an e-mail to Ms. Horn and Mr. Van Dyke indicating that if the merger could not get back on track by February 15, 2022, he would withdraw Velocity Cow from the merger negotiations. **Ex. G**. Ms. Horn never meaningfully responded to this e-mail, and February 15, 2022, came and went without any resolution as to a buy-out.

On February 17, 2022, Ms. Horn's attorneys provided a counter-offer to Mr. Van Dyke. **Ex. H**. Ms. Horn offered to sell her interest in VDH to Mr. Van Dyke for a staggering $1.3 million. **Ex. H**. Ms. Horn's offer for 60% of VDH was more than the valuation for the entire company from Prosper Group only a couple months earlier. No basis was provided for this unbelievable demand. **Ex. F**.

### D.   Peter Van Dyke Leaves VDH

Given that the year-long merger negotiations with Velocity Cow had collapsed, given that VDH did not have any meaningful succession plan for Ms. Horn's retirement, and given that Mr. Van Dyke simply could not afford a buy-out of Ms. Horn, Mr. Van Dyke resigned from VDH on March 4, 2022. As part of his resignation, Mr. Van Dyke assigned his interest in VDH to VDH for $1. **Ex. I**. VDH accepted this assignment of his interests and paid him $1. **Ex. J**.

Prior to his resignation, Mr. Van Dyke only worked for the benefit of VDH. Although Ms. Horn's attorneys believed that they had evidence that Mr. Van Dyke was trying to construct a new venture on February 23, 2022, Mr. Van Dyke's attorneys promptly assured them he was only working for the benefit of the company. **Ex. K**. During this time, Mr. Van Dyke did not solicit any VDH employees, and he did not try to convince people to rescind their acceptance of the VDH offer to join VVK. During this time, Mr. Van Dyke also did not solicit any clients, and only devoted his time to providing public relations services for VDH.[4]

---

[4]   Mr. Van Dyke confirmed in his affidavit that he did e-mail a file called "Peter Files" to his personal e-mail address. Mr. Van Dyke used his VDH computer for his personal matters, and the "Peter Files" were devoid of anything that could be considered a "trade secret." Mr. Van Dyke does confirm that there were a couple old employment contracts for VDH in this folder, but that he did not reference or rely upon them for any reason after he resigned from VDH. Further, there was a highly confidential client matter at VDH that the client requested be firewalled from Ms. Horn. Even after Mr. Van Dyke left VDH, Ms. Muirhead confirmed that

VDH falsely asserts that Mr. Van Dyke worked "for weeks, while still an officer and member of VDH…on creating a business plan for a new competing company…." (ECF No. 1 at ¶ 32.) VDH asserts that this alleged breach of Mr. Van Dyke's fiduciary duties is evidenced by Exhibit C to the Complaint. (ECF No. 1-4.) Not only does Exhibit C not contain information derived from VDH customer contracts, **Ex. A**, Van Dyke decl. at ¶ 21, but it was not created until March 10, 2022—six days after Mr. Van Dyke resigned from VDH. **Ex. D**, Haviland decl. at ¶¶ 9-11. The only way Exhibit C appeared on Mr. Van Dyke's computer was because Mr. Haviland inadvertently e-mailed it to Mr. Van Dyke's VDH e-mail address after Mr. Van Dyke had resigned from VDH. **Ex. D**, Haviland decl. at ¶¶ 9-11.

On the day that Mr. Van Dyke resigned, Ms. Horn asked Mr. Van Dyke to sign the Declaration attached as exhibit F to the Complaint. Mr. Van Dyke did not refuse to sign this document. Instead, he asked Ms. Horn to send the document via e-mail so that his attorney could review the document. Ms. Horn never e-mailed the document to Mr. Van Dyke, and she never asked him to sign it at any other time after she presented it to him on his last day with VDH.

One business day after his resignation, VDH issued a press release announcing that Georgella Muirhead had joined VDH, and that Mr. Van Dyke had

---

Mr. Van Dyke should continue working with that client. None of the client materials had any VDH information that could be considered a trade secret.

concluded his term "as CEO laws week to explore other opportunities." **Ex. L**. Despite asserting that only two weeks earlier that VDH had evidence that Mr. Van Dyke had breached his fiduciary duties, **Ex. K**, VDH wished Mr. Van Dyke well in his "future endeavors." **Ex. L**. After the press release was issued, Mr. Van Dyke received a number of calls from VDH clients that wanted to continue working with him for their public relations services.

After his resignation, Mr. Van Dyke never accessed his VDH e-mail, and he never accessed any VDH computer or asset.[5] Rather, Mr. Van Dyke returned his computer upon his resignation and his e-mail access was shut down within twenty-four hours of his resignation. When that access was terminated, moreover, he also lost many contacts on his phone—including VDH client contact information—and he did not have access to that contact information elsewhere.

Due to his longstanding relationship with the public relations clients, Mr. Van Dyke was able to provide continued public relations services to any clients that transferred their business to him because he had invested his own time and energy in learning their business needs. Mr. Van Dyke did not need to use any VDH alleged

---

[5]     Mr. Van Dyke also did not access the VDH server after his departure. The allegation in the Complaint that he attempted to make changes to a VDH contract after he resigned to make him the primary relationship partner makes no sense whatsoever as he was always the primary relationship partner on all VDH contracts.

trade secrets or confidential information in order to provide these services because he was able to rely on his extensive experience developed over decades.

### E.   **The Individual Defendants Begin VVK PR & Creative**

Mr. Van Dyke was hired as a consultant during the month of March and most of April by a number of VDH clients. During that time, VDH confirmed that they had no objection continuing to work with Mr. Van Dyke, who they knew to be providing services to these clients. **Ex. M**. At no point did VDH claim that Mr. Van Dyke was improperly using "trade secrets" or "confidential information" while providing services to these clients.[6]

On April 25, 2022, seven weeks after he left VDH, the individual defendants launched VVK.[7] All of the individual Defendants confirmed that they did not utilize any trade secrets or other confidential information of VDH in order to start VVK. Rather, each of them have relied upon their industry knowledge and expertise, along with the existing client base of Velocity Cow.

---

[6]     Ms. Horn did claim in an e-mail that some "noncompete" agreement was in effect after Mr. Van Dyke left VDH. When Mr. Van Dyke requested a copy of the alleged noncompete, Ms. Horn never responded and did not provide any agreement to Mr. Van Dyke. **Ex. N**

[7]     Demonstrating the absurdity of this lawsuit, on April 28, 2022, lead counsel for VDH contacted Mr. Van Dyke to congratulate him on the new role with VVK. **Ex. O**. Mr. Van Dyke noted that he was "excided to finally have this new venture launched and fortunate for the client portfolio." In that correspondence, Mr. Turner made no references to VDH's trade secrets or Mr. Van Dyke's breach of any fiduciary duties, but instead merely said "That's awesome", "Good for you!" and "Congratulations." **Ex. O**.

In order to begin VVK, the Defendants created entirely new service contracts for its clients without reference to the VDH contracts or client relationships. Similarly, VVK created an entirely new employment agreement. While VVK is optimistic about its future, the projections in the Crain's article attached to the Complaint included both the revenue generated by Velocity Cow clients as well as projected new business development conducted by VVK after the launch of the company.

## III.   VDH IS NOT ENTITLED TO INJUNCTIVE RELIEF

### A.   Controlling Legal Principles

A preliminary injunction is an "extraordinary remedy involving the exercise of a very far-reaching power, which is to be applied only in the limited circumstances which clearly demand it. *Apex Tool Grp., LLC v. Wessels*, 199 F. Supp. 3d 599, 606 (E.D. Mich. 2015). When considering a motion for preliminary injunction, a district court must balance four factors: (1) whether moveant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury without the injunction; (3) whether issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would be served by the issuance of the injunction. *See Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535, 542 (6th Cir. 2007). These factors "are to be balanced against each other. A preliminary injunction is an extraordinary remedy

which should be granted only if the movant carries his or her burden of proving that the circumstances clearly demand it." *Overstreet v. Lexington-Fayette Urb. Cty. Gov't*, 305 F.3d 566, 573 (6th Cir. 2002).

### B.    VDH Does Not Have A Likelihood Of Success On The Merits

VDH has not satisfied the extraordinarily high burden required for entry of a preliminary injunction. VDH's own speculation and unsupportable hyperbole is insufficient to warrant a preliminary injunction. *See NE. Ohio Coal. for Homeless v. Husted*, 696 F.3d 580, 491 (6th Cir. 2012). "[T]he proof required for the plaintiff to obtain a preliminary injunction is much more stringent than the proof required to survive a summary judgment motion[.]" *Leary v. Deschner*, 228 F.3d 729, 739 (6th Cir. 2000).

VDH seeks injunctive relief relying solely on the Defend Trade Secrets Act ("DTSA"). 18 U.S.C. § 1839. VDH cannot sustain a claim under the DTSA. First, a claim under the DTSA is predicated on the alleged trade secret to in fact have been maintained as secret. 18 U.S.C. § 1839(3)(A); *See Quantum Sail Design Group, LLC v. Jannie Reuvers Sails, Ltd.*, 2015 WL 404393, at *7 (W.D. Mich. Jan. 29, 2015) (quoting *Kubik, Inc. v. Hull*, 224 N.W.2d 80, 87 (Mich. Ct. App. 1974)("To be a trade secret, the information must, of necessity, be a secret.") Indeed, a "trade secret must be identified clearly, unambiguously, and with specificity" such that it may "inform the defendants what is alleged to have misappropriated." *Dura Global*

14

*Technologies, Inc. v. Magna Donnelly Corp.*, 2008 WL 2064516 (E.D. Mich. May 14, 2008).

VDH did not actually maintain its alleged trade secrets and confidential information in any way. Most important for this case, VDH did not have Mr. Van Dyke or Ms. Horn execute a restrictive covenant that identified the alleged trade secrets and prevented either executive from leaving and establishing a competitive business. Similarly, when VDH brought in a third party consultant or engaged in merger discussions, neither Ms. Horn nor Mr. Van Dyke insisted on any sort of confidentiality or non-disclosure agreement. Contrary to VDH's absurd allegation that it believes the identity of its clients are confidential, VDH publishes the names of its clients on its website. Stated simply, VDH did not actually protect the information that it now claims to be trade secrets as trade secrets in its ordinary course of business.

Not only did VDH fail to employ any restrictions on the information it now claims to be a trade secret, but VDH also fails to describe with any particularity what, in fact, the trade secrets are. VDH has just spoken generally about what might have been done, but does not provide this Court with any specific trade secret that has been misappropriated. As set forth in Defendants' Motion to Dissolve the Temporary restraining Order, such vagueness prevents entry of an injunction against

Defendants. *See, e.g., Corning, Inc. v. PicVue Elec., Ltd.*, 365 F.3d 156, 157-58 (2d Cir. 2004).

Second, under 18 U.S.C. § 1836(b)(3)(A)(i)(I), an injunction to prevent the actual or threatened misappropriation of a trade secret "shall be based on evidence of threatened misappropriation and ***not merely on the information the person knows***." (emphasis supplied.) Often described as the inevitable disclosure doctrine, this concept has been rejected by Michigan courts in applying the Michigan Uniform Trade Secrets Act. *CMI Int'l, Inc. v. Intermet Int'l Corp.*, 649 NW2d 808, 813 (Mich. Ct. App. 2002) (rejecting the doctrine and noting that it would compromise the rights of individuals to migrate from one job to another).

VDH claims there is no way that VVK could have success without using VDH's alleged trade secrets. In reality, VVK will have success because of the know-how and personal knowledge of its executives—people who have been employed in the marketing and public relations fields for years. As the declaration of Peter Van Dyke confirms, he is able to succeed in this field because of his in-depth understanding and knowledge of his clients' businesses, as well as his personal and professional relationships with his clients. None of these are protectable trade secrets—they are exactly the sort of personal knowledge that the DTSA expressly exempts from its relationship.

16

Finally, VDH does not satisfy the high requirement of proof for an injunction because it presents the Court with nothing but conjecture. Although VDH has had Mr. Van Dyke's work computer for nearly three months, VDH has presented this court with no forensic analysis that could support their reckless and dishonest assertions. In fact, VDH's claims about Exhibit C to the Complaint are provably false. Specifically, VDH claims that while Mr. Van Dyke was an officer of VDH, Defendants were working "on creating a business plan for a new competing company[.]" (ECF No. 1 at ¶ 32, referencing Exhibit C.) In reality, the document attached as Exhibit C was created by a third party on March 10, 2022, only after Mr. Van Dyke left VDH. **Ex. D**, Haviland decl. at ¶¶ 9-11. Moreover, the document does not identify actual contract amounts for VDH clients, but instead only speaks generally about potential revenue from potential clients (which does not actually match the monthly revenue from those clients to VDH), and identifies potential employees Mr. Van Dyke wanted to hire, but only after he left VDH (and because he had no non-solicitation agreement limiting his ability to do so). **Ex. A**, Van Dyke decl. at ¶ 21. Although VDH claims to have found this document on Mr. Van Dyke's computer, the only way it appeared there was because Mr. Haviland inadvertently e-mailed it to Mr. Van Dyke's VDH e-mail address after Mr. Van Dyke had left VDH. Mr. Van Dyke never used it, developed it, or accessed it using VDH computing equipment.

17

Similarly, VDH claims that—not even under information and belief—that Mr. Van Dyke "used a VDH computer and secretly uploaded the company's trade secrets, including dozens of complete client files and confidential business information, into two zip file drives and e-mailed them to his personal email address." (ECF No. 1 at ¶ 37.) Mr. Van Dyke explained that these files were largely personal in nature and did not contain anything constituting "complete client files" or "confidential business information." Defendants have retained J. Stott Matthews of Spectrum Forensics to image and catalogue this file in order to demonstrate that VDH's claim is false and absurd. Of course, VDH makes no similar claims against Mr. Sherman or Ms. Walters because they also have no evidence to support their outrageous assertions.

VDH then claims that Mr. Van Dyke deleted files to cover up his tracks, but VDH does not provide the Court with any evidence that Mr. Van Dyke did anything other than what he says: he cleared off his personal information from his laptop before he left. VDH only has its speculation about whether Defendants actually did anything in violation of the DTSA. Such speculation, especially with the passage of months within which they could establish that evidence, cannot satisfy VDH's high burden of proof to warrant the issuance of the extraordinary relief of a preliminary injunction.

### C.   **VDH Has Not Suffered Irreparable Harm**

To be granted an injunction, a "plaintiff must demonstrate, by clear and convincing evidence, actual irreparable harm or the existence of an actual threat of such injury." *Patio Enclosures, Inc. v. Herbst*, 39 F. App'x 964, 969 (6th Cir. 2002). As a threshold matter, VDH must demonstrate a probable, non-speculative injury in order to prevail on a motion for injunctive relief. "A showing of probable irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction." *Lucero v. Detroit Pub. Sch.*, 160 F. Supp. 2d 767, 801 (E.D. Mich. 2001); *see also Hacker v. Federal Bureau of Prisons*, No. 06-12425, 2006 WL 2559792, at *7 (E.D. Mich. Sep. 1, 2006) (holding that plaintiff's failure to demonstrate irreparable harm was dispositive of the motion for a preliminary injunction and an evaluation of the other factors was not required)."Irreparable harm is an 'indispensible' requirement for a preliminary injunction, and 'even the strongest showing' on the other factors cannot justify a preliminary injunction if there is no 'imminent and irreparable injury.'" *Memphis A. Philip Randolph Ins. v. Hargett*, 978 F.3d 378, 391 (6th Cir. 2020) (quoting *D.T. v. Sumner Cty. Schs.*, 942 F.3d 324, 326-27 (6th Cir. 2019).). To constitute irreparable harm, the "injury must be certain, great, and actual." *Lucero*, 160 F. Supp. 2d at 801. Irreparable harm cannot be speculative because the complained-of injury must be so imminent that

there is a "clear and present need for equitable relief to prevent irreparable harm."
*Id.*

VDH fails to establish any harm that could be defined as "imminent and irreparable. VDH asserted before Mr. Van Dyke resigned that they believed he was using VDH materials to start a new company. **Ex. K**. Days after Mr. Van Dyke resigned, Ms. Horn claimed that there was a noncompete in effect, even though she never provided Mr. Van Dyke with a copy of the noncompete she asserted was in effect. **Ex. N**. During that same time, Ms. Muirhead, speaking on behalf of VDH, confirmed that VDH was happy to work with Mr. Van Dyke, without any concern or reference to alleged "trade secrets" or confidential information that Mr. Van Dyke is now alleged to have taken. **Ex. M**.

If this matter were one that warranted the extraordinary relief of an ex parte temporary restraining order and a preliminary injunction, VDH should not have consented to Mr. Van Dyke's work in the marketplace for its clients. Similarly, if the damages complained of were truly "irreparable", VDH should have taken action much sooner.[8]

Rather than demonstrating irreparable harm, VDH pleads, in effect, a case for lost profits, which can be reasonably remedied with monetary damages. Irreparable

---

[8] Truly, the only reason for the delay appears to have been that they wanted the unjustifiable effect of serving Mr. Van Dyke with the instant lawsuit on his birthday.

harm cannot be established where money damages are sufficient to make it whole. *See Merrill Lynch, Pierce, Fenner & Smith Inc. v. E.F. Hutton & Co.*, 403 F. Supp. 336, 343 (E.D. Mich. 1975) ("The moving party must demonstrate a noncompensable injury, for which there is no legal measure of damages, or none that can be determined with a sufficient degree of certainty."); *Overstreet*, 305 F.3d at 578 ("A plaintiff's harm from the denial of a preliminary injunction is irreparable if it is not fully compensable by monetary damages."). *See also Prime Therapeutics LLC v. Beatty*, 354 F. Supp. 3d 957, 975 (D. Minn. 2018) ("[T]his case is about money. No historic building is going to be destroyed. No toxins are going to be released into the environment. No ship is going to leave port, never to return. King stole clients away from WFI, and the main harm that WFI suffered is lost profits on the business of those clients. By definition, lost profits are 'reparable' through money damages.") Moreover, irreparable harm is not satisfied by any alleged past conduct of Defendants is not necessarily indicative of future conduct. *See DTC Energy Grp., Inc. v. Hirschfeld*, 912 F.3d 1263, 1270 (10th Cir. 2018)("The purpose of a preliminary injunction is not to remedy past harm, but to protect plaintiffs from irreparable injury that will surely result without their issuance.")

Defendants did not "steal" any clients, but it did engage in exactly the sort of competition upon which this country's economy is based upon. Clients could opt to stay with VDH or move to work with Mr. Van Dyke, who had no restriction on his

ability to do that. Even though Defendants contest the allegation that VDH is entitled to lost profits whatsoever, to the extent that VDH has suffered an injury, it certainly is reparable with monetary damages.

### D.    An Injunction Does Not Serve The Public Interest

The public interest is served by allowing Defendants to pursue their careers in their chosen fields. Even the DTSA confirms that any injunction based on its statute must not be based on personal information known to the Defendants. No public interest is served in limiting the clients from choosing, as they already have, VVK instead of VDH. Rather, the public interest is entirely served by allowing Defendants to freely compete with VDH while relying on their long-standing business expertise, acumen, and reputations.

### E.    The Balance Of Harms Favors Defendants

Courts must consider the harm to others if an injunction were granted and "balance the equities." *See Liberty Coins, LLC v. Goodman*, 748 F.3d 682, 689-90 (6th Cir. 2014). An injunction of the scope proposed by VDH could harm the economic rights of an employee who wishes to work for Defendants, as well as prospective clients of VDH or VVK that make the independent decision to exercise their rights to select a public relations firm of their choosing. To the extent VDH believes solicitation has already occurred, it is unclear what preliminarily enjoining further solicitation could help solve—the damage has allegedly been done, and the

issue now is whether VDH can prove it. *See CDI Energy Servs. v. W. River Pumps, Inc.*, 567 F.3d 398, 403 (8th Cir. 2009) (upholding district court decision denying preliminary injunction where the "wrongful appropriation of [the plaintiff's] clients . . . was already carried out," and court "did not want to order (and lacked the authority to order) the customers to cease doing business with defendants and return to [the plaintiff's company].") Consequently, the balance of harms falls in favor of Defendants and the request for a preliminary injunction should be denied.

## IV.   <u>CONCLUSION</u>

WHEREFORE, Defendants Peter Van Dyke, Jamie Kaye Walters, Michael

Sherman, and VVK PR & Creative, LLC respectfully request that this Court enter

an Order denying the instant Motion and awarding Defendants their attorneys' fees

and costs incurred in responding to this Motion.

Respectfully submitted,

WINTRHOP & WEINSTINE, P.A.

By: <u>s/H. William Burdett, Jr.</u>
        H. William Burdett, Jr. (P63185)
        Michelle D. Champane (P80917)
19 Clifford Street
Detroit, Michigan 48226
bburdett@winthrop.com
(313) 318-9203

-and-

Maurice G. Jenkins (P33083)
JACKSON LEWIS PC
2000 Town Center Suite 1650
Southfield, Michigan 48075
(248) 936-1900

Dated: May 31, 2022
*Attorneys for Defendants*

**<u>Proof of Service</u>**

I, H. William Burdett, Jr., certify that on May 31, 2022, I filed the foregoing with the Court's electronic filing system, which served notice of same on all counsel of record.

s/H. William Burdett, Jr.

H. William Burdett, Jr.
*Attorney for Defendants*

24061866v2